Toomer *vs.* Dickerson.

HENRY L. TOOMER, plaintiff in error, *vs.* HENRY J. DICK-ERSON, defendant in error.

Where D. became security for T., the principal debtor on a bond, for negroes purchased in the State of South Carolina, and T., the principal debtor, executed a mortgage upon the negroes, so purchased, to the creditor to secure the payment of the debt, which mortgage was recorded in the State of South Carolina, but was not recorded in this State, into which the negroes were removed shortly after the purchase —within six months after the removal of the same, as required by the statute of this State; held that the failure of the creditor to record his mortgage in this State, within six months after the removal of the property therein, was such an act of omission of duty required by law as increased the risk of the security, and exposed him to greater liability, and therefore, under the well settled rule of law in this State, the security was discharged.

*Held:* also, that when a plaintiff seeks to enforce his *remedy* upon a contract made in another State, in the Courts of this State, such judgment is to be rendered, as the laws of this State authorize and require, and *not* such a judgment as the laws of the State where the contract was made, may authorize and allow. The *lex fori*, and *not* the *lex loci*, governs as to the *remedy* in the Courts of this State in a suit to enforce the performance of a contract against a surety thereon, made in another State.

Demurrer. Decided by JUDGE FLEMMING. Chatham Superior Court. May Term, 1867.

On the 25th day of June, A. D., 1866, in the County Court of said county, Henry L. Toomer commenced his statutory action against John F. Tucker and Henry J. Dickerson, on their bond for the penal sum of one hundred and seven thousand, three hundred dollars ($107,300,) which, at the trial term, was transferred by consent of parties to the appeal docket of the Superior Court.

When the cause came up for trial, the defendants having pleaded separately, the plaintiff moved the Court to strike out all the said pleas except the first plea of the defendant Tucker, which was a plea of partial payment; and the motion was sustained, and the pleas stricken out accordingly.

The defendant Dickerson then filed the following pleas:

Toomer *vs.* Dickerson.

HENRY J. DICKERSON,
     *ats.*
HENRY L. TOOMER.

1st. That he signed said bond, the subject matter of said action, as surety, and is only liable as such.

2d. That the said plaintiff, at the time when said bond and the first installment thereof became due and payable, forbore to call on said Tucker to pay said bond, and, on the contrary, gave time to said Tucker to pay said bond, and the money thereon, and, by said forbearance and giving time, injured said Dickerson, security, and increased his risk and exposed him to liability.

.3d. That when he signed said bond as security, the said H. L. Toomer took and received from the said John F. Tucker, a mortgage on ninety negro slaves, as collateral security, to secure the payment of said bond, and that when said bond and mortgage became due the said H. L. Toomer failed and delayed for over three years to proceed upon said mortgage and collect said money so due, by the sale of said negroes so mortgaged, but delayed until the emancipation of said negro slaves destroyed said collateral security, which delay increased the risk and liability of said defendant, Dickerson.

4th. That when the said H. L. Toomer took said mortgage on said negroes, as above alleged, as collateral security, he entirely neglected and failed (after the said negroes had been brought into the State of Georgia) to record the said mortgage in Georgia, as required by the laws of Georgia, and by such failure impaired the lien upon said negroes, and thereby increased the risk and liability of said defendant, Dickerson.

5th. That the forbearance and delay of said Toomer to proceed and collect the money due on said bond from said Tucker, injured said defendant, inasmuch as during the time given by said delay to said Tucker he became insolvent, by reason of emancipation of the negroes sold to him, and mortgaged by him to Toomer, and by said delay and its consequences the risk of this defendant, as security, was increased.

6th. That by reason of the failure to record the said mort-

gage on said negroes on the part of said Toomer, this defendant was injured, his risk was increased, and his liability extended, inasmuch as judgments were obtained against said Tucker, which took precedence of the lien of said mortgage.

The plaintiff then moved to strike out all of said pleas except the first. The Court sustained said motion as to the 2d, 3d and 5th of the said pleas, which were stricken out accordingly; but allowed the 4th and 6th of the said pleas.

The cause then went to trial on the 1st plea of the defendant, Tucker, and the 1st, 4th and 6th pleas of the defendant, Dickerson, on the evidence following; and a verdict was rendered for the plaintiff against the defendant, Tucker, for $50,000, with interest from the 1st day of January, A. D., 1864, and on $3,500 from the 1st day of January, A. D., 1865, and on the like sum from the 1st day of January, A. D., 1866, and on the like sum from the 1st day of January, A. D., 1867; but the defendant, Dickerson, was discharged.

The evidence adduced on the trial was as follows:

The plaintiff introduced in evidence the bond sued on, with the indorsements thereon, which are as follows:

The State of South Carolina. Know all men by these presents, That, We—John F. Tucker and Henry J. Dickerson, of the City of Savannah, in the State of Georgia, are jointly and severally held and firmly bound unto Henry Laurens Toomer, of the city of Charleston, State of South Carolina, in the full and just sum of one hundred and seven thousand three hundred dollars, to be paid unto the said Henry Laurens Toomer' as aforesaid, his certain attorney, executors and administrators or assigns: to which payment, well and truly to be made and done, we bind ourselves and each and every of our heirs, executors and administrators, jointly and severally, firmly by these presents, sealed with our seals and dated the 1st day of December, in the year of our Lord one thousand eight hundred and fifty-seven, and in the eighty-second year of the Sovereignty and Independence of the United States of America.

The condition of the above obligation is such that if the above bound John F. Tucker and Henry J. Dickerson, as aforesaid, or either of them, their or either of their heirs, executors or administrators, shall and do well and truly pay, or cause to be paid, unto the above named Henry Laurens Toomer, as aforesaid, his certain attorney, executors or administrators or assigns, the full and just sum of fifty-three thousand six hundred and fifty dollars, to be paid as follows, viz: The first installment of seventeen thousand eight hundred and eighty-three dollars thirty-three

Toomer *vs.* Dickerson.

hundredths ($17,883 33) on the 1st day of January, which will be Anno Domini, one thousand eight hundred and sixty-one (1861,) the second installment, of seventeen thousand eight hundred and eighty-three dollars thirty-three hundredths ($17,883 33) to be paid on the 1st day of January, which will be Anno Domini (1862;) and the third and last installment of seventeen thousand eight hundred and eighty-three dollars thirty-three hundredths ($17,883 33) to be paid on the first day of January, which will be Anno Domini (1863,) with interest, annually, from the date hereof on the whole amount unpaid, until the whole principal and any interest that may become due and unpaid, shall both be paid and satisfied fully—then the obligation to be void and of none effect, or else to remain in full force and virtue. · Sealed and delivered in presence of:

R. F. AKIN, Notary Public C. C.

JOHN F. TUCKER, [L. S.]<br>H. J. DICKERSON, [L. S.]

(Endorsements as on said bond.)

CHARLESTON, January 5th, 1859.

Received from John F. Tucker, thirty-seven hundred and fifty-five 50-100 dollars one year interest on the within bond to 1st January, 1859.
$2,755,50-100                     H. LAURENS TOOMER.

Received, Charleston, January 10th, 1860, from J. F. Tucker, thirty-seven hundred and fifty-five 50-100 dollars, being in full of one year's interest to 1st instant on the within bond.
$3,755,50-100                     H. LAURENS TOOMER.

Received, Charleston, April, 1862, three thousand eight hundred and twenty-three 37-100 dollars, on account of the interest on within bond, up to the 1st day of December, 1861, and three thousand dollars on account of principal.
$3823.37.                     H. L. TOOMER.

Received, Charleston, January 3d, 1863, from J. F. Tucker, Esq., three thousand five hundred and forty-five 50-100 dollars on account of the interest on within bond for one year, and 650 six hundred and fifty dollars on account of principal.
$4195.50                     H. L. TOOMER.

Received, Charleston, January 12th, 1864, from John F. Tucker, Esq., three thousand five hundred and eight 50-100 dollars in full of one year's interest on the within bond to date.
$3503.05.                     H. L. TOOMER.

The plaintiff then closed his case, and the said Henry J. Dickerson introduced the following testimony:

JOHN F. TUCKER was sworn and testified as follows:

Mr. Dickerson signed the bond as surety only, receiving

no consideration therefor. The bond was given for the purchase money of ninety-one negroes, which I bought from the plaintiff. The transaction took place in South Carolina, where the negroes were. I gave at the same time a mortgage of the negroes to the plaintiff to secure the bond. I brought the negroes about the same time into this county, where I resided, and where they remained until emancipated.

JOHN COOPER was sworn for the purpose of proving the execution of a paper presented to him, purporting to be the mortgage above referred to.

The said mortgage was then introduced, and is as follows:

THE STATE OF SOUTH CAROLINA:

To all whom these presents shall come:

I, John F. Tucker, of the city of Savannah, in the State of Georgia, send greeting:

Whereas, I, the said John F. Tucker, as aforesaid, in and by my certain bond or obligation, wherein Henry J. Dickerson is named as surety, bearing date even with these presents, stand firmly held and bound unto Henry Laurens Toomer, of the city of Charleston, in the State aforesaid, in the penal sum of one hundred and seven thousand three hundred dollars, ($107,300,) with a condition thereunto written for the payment of the full and just sum of fifty-three thousand six hundred and fifty dollars, ($53,650,) as in and by said bond and condition thereof, reference being thereunto had, will more fully and at large appear.

Now know ye, that I, the said John F. Tucker as aforesaid, for the better securing the payment of the said sum of fifty-three thousand six hundred and fifty dollars, ($53,650,) unto the said Henry Laurens Toomer, his heirs, executors, administrators or assigns, together with lawful interest for the same, I, the said John F. Tucker, as aforesaid, have bargained and sold, and by these presents do bargain and sell, and in plain and open market deliver unto the said Henry Laurens Toomer as aforesaid, the following named ninety-one negro male and female slaves, to-wit: [giving their names]: To have and to hold the said slaves as above named and numbered, together with the future issue and increase of the females, unto the said Henry Laurens Toomer as aforesaid, his executors, administrators and assigns forever.

Provided always, nevertheless, that if the said John F. Tucker and Henry J. Dickerson as aforesaid, or either of them, their or either of their heirs, executors, or administrators shall and do well and truly pay, or cause to be paid unto the said Henry Laurens Toomer as aforesaid, his certain attorney, executors, administrators, or assigns, the full and just sum of fifty-three thousand six hundred and fifty dollars, ($53,650,) according to the intent and meaning of the bond aforesaid and of these

Toomer *vs.* Dickerson.

presents, together with the lawful interest, then this deed of bargain and sale, and all and every clause, article and thing therein contained shall cease, determine and be utterly void and of none effect, anything hereinbefore contained to the contrary thereof, in any wise, notwithstanding.

And it is hereby declared by and between the said parties, and the said John F. Tucker as aforesaid, his executors, administrators and assigns, doth covenant, promise and agree to and with the said Henry Laurens Toomer as aforesaid, his executors, administrators and assigns, by these presents, that if default shall happen to be made of or in payment of the said sum of fifty-three thousand six hundred and fifty dollars, ($53,650,) as aforesaid, according to the true intent and meaning of the bond aforesaid, that then, in such case, it shall and may be lawful for the said Henry Laurens Toomer, as aforesaid, his executors, administrators, attorneys or agents, from time to time, and at all times hereafter, peaceably and quietly to enter into any or all the messuages, lands or tenements of the said John F. Tucker, as aforesaid, and to take the aforesaid negro male and female slaves, and their increase, into his custody and possession, and the same to hold and detain to his own use and behoof (as his own proper goods and chattels) from thenceforth and forever, or the same to sell and dispose of at will and pleasure; returning the overplus, if any should happen to be, after paying the said sum of fifty-three thousand six hundred and fifty dollars, interest, costs, and charges of collection, unto the said John F. Tucker as aforesaid, his executors, administrators or assigns.

In witness whereof, I, the said John F. Tucker as aforesaid, have hereunto set my hand and seal, this first day of December, in the year of our Lord one thousand eight hundred and fifty-seven, and of the sovereignty and independence of the United States of America the eighty-second year.

Signed, sealed and delivered in presence of
    JOHN COOPER.      JOHN F. TUCKER,  [L. S.
R. F. AKIN,
    Notary Public, C. C.

STATE OF GEORGIA—*Chatham County.*

By this public instrument, be it remembered that on this eighth day of December, A. D., eighteen hundred and fifty-seven, before me the subscriber, Edward G. Wilson, a Commissioner in and for the State of Georgia, appointed by the Governor of the State of South Carolina, to take proof and acknowledgment of deeds, mortgages, or any other instrument to be used or recorded in the said State of South Carolina, personally came before me at the city of Savannah, within my jurisdiction as commissioner aforesaid, John F. Tucker, the person who executed the within instrument of writing, and who is personally well known unto me, and acknowledged that he executed the within mortgage or instrument of writing for the uses and purposes therein stated, and desires that the same might be used and recorded as such in the State of South Carolina.

In testimony whereof, I have hereunto set my hand and affixed my seal as commissioner as aforesaid, at Savannah, Georgia, this the eighth day of December, A. D., eighteen hundred and fifty-seven.

EDWARD G. WILSON, [L. S.]
Commissioner of Deeds, etc.,
for the State of S. C., at Savannah, Ga.

[INDORSED.]

John F. Tucker,
      to          } *Mortgage.*
Henry Laurens Toomer.
   Dated 1st December, 1857.
   Received 23d December, 1857.

SECRETARY STATE'S OFFICE,
Charleston, S. C., Dec. 23d, 1867. } The within mortgage is duly recorded in mortgage book, L.L.L.L., page 195, 196 and 197.

Examined and certified to by JAMES A. DUFFUS,
Fee 2.50-100 paid.                    Deputy Secretary, State.
            DUFFUS.

The mortgage bearing no certificate of record in Chatham county, William H. Bullock, the Clerk of the Superior Court of said county, was sworn, and introducing the County Records, from December, 1856, through December, 1858, showed that the mortgage was not recorded during that time.

Upon this brief of testimony the plaintiff moved for a new trial upon the following grounds:

1. Because his Honor allowed the fourth and sixth pleas contained in the answer of the said Henry J. Dickerson.

2. Because his Honor charged the jury that if they should find that the mortgage of negroes, given by the said John F. Tucker to the plaintiff to secure the bond sued on, was not recorded in this county within six months after the said negroes were brought into the county, the said Henry J. Dickerson was thereby totally discharged from his liability as surety on said bond.

3. Because his Honor charged the jury that it was not necessary for the said Henry J. Dickerson to prove any actual loss to him by reason of the failure of the plaintiff to record the said mortgage within the time aforesaid, in order to entitle himself to be discharged from his liability as surety on said bond.

Toomer *vs.* Dickerson.

4. Because the charge of his Honor upon the defence set up by the said Henry J. Dickerson was contrary to law.

5. Because the verdict of the jury was contrary to law and evidence in so far as it discharged the said Henry J. Dickerson from liability.

The charge of the Court was as set forth in the 2d and 3d grounds. in said motion.

The motion having been submitted without argument, it was ordered, upon the consent of counsel, that the decision of the Judge should be rendered in vacation. He overruled the motion, and refused the new trial. This refusal is assigned as error.

JACKSON, LAWTON & BASINGER, for plaintiff in error, made the following points and cited the following authorities:

This mortgage was delivered in South Carolina and is governed by the laws of that State. Bl. Com., 307; Toomer vs. Tucker, 36 Geo. R., 138; Story on C. of L., secs. 267, 280 to 395; 4 Geo. R., 3; 13 Peters, 65; 13 Mass., 19; 6 Peters, 297, 298. Want of record would not discharge surety in South Carolina. Hampton vs. Levy, 1 McCord, Ch., 107; Lainy vs. Brevard, 3 Strobh. Eq. R., 59; Capel vs. Butler, 2 S. & S., 457.

The surety is only discharged *pro tanto.* Capel vs. Butler 15 N. H., 119. Springer vs. Toothaker, 43 Maine, 381; Everly vs. Rice, 20 Penn. (8 Harris) 252; Perrine vs. F. Ins. Co., 22 Ala., 575; Neff's Appeal, 96; Watts & S., 36; Payne vs. Com. Bk. Natchez, 6 S. & M., 24; Smith vs. McLeod 3 Lee, Ch. 390; Nelson vs. Williams, 2 Dev. & Bat., Ch., 118; Griswold vs. Jackson, 2 Edw., Ch. 461; Cullum vs. Emanuel, 1 Ala. N. S., 23; Ward vs. Vass, 7 Leigh, 135; 2 L. Cas. in Eq., 374; Theobald on Princ. and Surety, 140 tc 144.

THOMAS E. LOYD and HARTRIDGE & CHISOLM made the following points and cited the following authorities for the defendant in error:

That a security on the bond sued on, is entitled to the same

defences at law as in equity. 2 Bailey's R. ; 8 Pick ; 7 Johns, 337 ; 2 Johns' Ch. R., 554.

"Any act of the creditor which increases the risk of the security, or exposes him to *greater liability*, will discharge him." Code of Georgia, sec. 2131.

This is only the enunciation of the principle prevailing in equity prior to the adoption of the Code, and at law in Georgia. 4 Geo. R., 401 ; 3 Kelly, 411, etc.

Any *laches* or omission on part of creditor to do what duty to surety and equity require, whereby the surety has his *risk increased*, or is exposed to *greater liability*, will also discharge the surety, especially in those cases in which the creditor has taken collateral security from the principal debtor for the payment of the debt. In such cases he is *trustee* for the surety, and any act or any omission on his part in reference to this collateral security, which increases the risk, or adds to the liability of the surety will discharge the surety. 2 Amer. L. Cases (4th ed.) 343, 345 ; 8 Pick, 122 ; 22 Ala., 575 ; 15 N. Hampshire, 110 ; 4 Johns' Ch. R., 223 ; 19 Eng. L. & Eq., 64, 239 ; 1 Amer. L. C., 348, 349 ; 3 Comstock's R., 459 ; 2 Sim & Stuart, 457 ; 5 Eng. Exchequer R., 246 ; 1 Smedes & Mar., 189 ; 6 Smedes & Mar., 38 . 23 Geo. R., 181 ; 30 Geo. R., 252, 93.

The failure to record the mortgage, in this case, "increased the risk" of the surety, and "exposed him to greater liability." Therefore he was discharged. Cobb's Dig., 172 ; Code of Geo., secs. 1958, 1959.

It is not necessary that the surety should *prove any* injury, or damnification ; the *instant* the risk or liability is increased he is discharged. 2 Penn. R., 437 ; 2 Amer. L. Cases, 340 ; 4 Geo. R., 401.

The cases apparently opposed to the doctrines above set forth all admit and recognize the principle that the failure to sue the principal debtor, on the part of the creditor, after a request from the surety, *discharges the surety entirely.* 3 Strobhart's Eq. R.; 1 McCord's Ch. R.

The act of the Legislature of Georgia passed in 1831, in

reference to notice to sue, adopts the same principle.   4 Geo. R. 402.

It is not necessary that the surety should pay the debt of his principal before he can avail himself of the acts or omissions of the creditor to discharge him.   3 Kelly, 251 ; 13 Johns' R., 174.

The creditor must prove that there was no loss, or its extent.   Holt vs. Body, 9 Harris ; 15 N. Hampshire, 119 ;  5 Hill, 466 ;  2 Amer. L. Cases, 369.   As to Dickerson, this was a Georgia contract.   Levy vs. Cohen, 1 Kelly R.

WARNER, C. J.

The only question presented, by the record in this case, for our consideration and judgment, is whether Dickerson, the security upon the bond of Tucker, the principal debtor, is discharged from the payment of the debt to the creditor, by reason of the *failure* of the latter to record his mortgage upon the negro slaves when removed into this State, as required by the laws thereof.   The creditor, it appears, took a mortgage upon ninety-one slaves to secure the payment of his debt, and also took personal security for the payment thereof.   The mortgage upon the slaves was executed and recorded in the State of South Carolina ;  the bond upon which Dickerson became security was executed by him in this State.   Shortly after the execution of the mortgage, the negroes mentioned therein were removed into this State by Tucker, the mortgagor, where he resided, at the time of the execution of the same, and at the time of the purchase of the negroes from Toomer, the plaintiff.   By the statute law of this State, mortgages on personal property, executed *without* the limits thereof, when the property so mortgaged is brought *within* this State, are required to be recorded in the clerk's office of the Superior Court of the county where the mortgagor resides, or if a nonresident, then in the county where the mortgaged property is, *within six months after such mortgaged property is brought into the State*.   Such mortgages, not recorded within the time specified, remain valid as against the mortgagor, but are *post-*

*poned to all other liens,* created or obtained, or purchases made from the mortgagor, prior to the actual record of the mortgage. Revised Code, secs. 1946, 1947.

Whatever may be the rule of law in other States or other countries, as to the discharge of securities from liability : yet, in this State, it is not now an open question upon the statement of facts, contained in this record. In Jones vs. Whitehead, 4 Georgia Rep., 401, this Court asserted, and recognized the rule to be, " that whenever the creditor does an act, whereby injury, or loss, or *liability to loss,* or *increased risk accrues to the surety,* without his assent, he is entitled to be discharged. And the Courts uniformly refuse to require of the surety to show that he has *in fact been damnified."* The same principle was asserted by this Court, in the case of Brown vs. Ex'rs of Riggins, 3 Kelly's Rep., 412. The rule asserted in the two cases just cited, has been adopted by the Legislature, and incorporated into the Code of Laws of this State. By the 2126th section of the Revised Code, it is declared that " any act of the creditor, either before or after judgment against the principal, which injures the surety, or *increases his risk,* or *exposes him to greater liability,* will discharge the security." The public law of the State, required the creditor to record his mortgage in the county into which the property had been removed, within six months after its removal, which has *not been done.* Is this failure to record his mortgage, in obedience to the requirement of the law, such an act of *omission* on the part of the creditor, as *increased the risk* of the security, *or exposed him to greater liability?* The language of the Code is, " *any act of the creditor,"* which may as well be an *act of omission,* as any other act, whereby the risk of the security is increased, or exposes him to greater liability. An act of *omission* on the part of the creditor, when the law requires him *to act,* may be quite as potent for mischief to the security, as an act of *commission.* The question to be answered is, did this *act of omission* on the part of the creditor, in *not* doing what the law required him to do, *increase the risk* of the security, or *expose him to greater liability?* When we take into consider-

Toomer *vs.* Dickerson.

ation the fact, that if the security had been compelled to pay this debt to the creditor, he would have been entitled to the benefit of the mortgage lien upon his principal's property, in short, to have been *subrogated* to all the creditor's rights and securities, held by him against the principal debtor, we shall then readily discover to what extent his risk has been increased, and to what extent he has been exposed to greater liability by the failure of the creditor to record his mortgage as required by law.   By the creditor's act of omission to record his mortgage, his *lien* upon the principal debtor's property, (to which his security would have been entitled, to reimburse himself in the event of the payment of the debt by him,) will be *postponed* to all other leins, created or obtained against that property, or purchases made from his principal debtor prior to the actual record of the mortgage.

But it was insisted in the argument of this case, that the security had suffered no injury from the failure of the creditor to record the mortgage.   Upon that point, the record is *silent*. The security has shown, that by the act of the creditor, his *risk* has been increased, and that he has been *exposed* to greater liability, which is sufficient *prima facie at least*, to discharge him.   The plaintiff has not attempted to show by any evidence in the record, that he was not in fact injured in consequence of his increased risk and exposure to greater liability.   We know nothing upon that point in the case, except what the record discloses.   The record discloses the fact, that in consequence of the failure to record the mortgage, as required by law, the risk of the security was increased, and that he has been exposed to greater liability; at least such is necessarily the *legal effect*, from the facts proved in the record.

It was further insisted in the argument, that although the bond was executed in Georgia, it was intended to be, and was in fact, a South Carolina contract, and as such should be governed by the laws of the latter State in its enforcement in the Courts of this State.   Conceding *ex gratia*, that it is a South Carolina contract, the plaintiff seeks to enforce it in the Courts of *this State*.   Neither the *validity* nor the *construc-*

*tion* of the contract is questioned. ` The only controversy between the parties is as to the *remedy* upon that contract in the Courts of *this State*. The question here is, can the creditor enforce his *remedy* against the security upon his South Carolina contract in the Courts of *this State*, in accordance with our laws *regulating that remedy?* We give to him the same rights and remedies in our Courts, for the enforcement of his contract, as we give to our own citizens; no more, no less. Mr. Justice Story states the rule correctly, when he says: "Whenever a *remedy* is sought, it is to be administered according to the *lex fori*, and such a judgment is to be given as the laws of the State, where the suit is brought, authorize and allow, and *not* such a judgment as the laws of other States authorize or require." Story's Conflict of Laws, 954, section 572. Dela Verga vs. Vienna 20, Eng. Com. Law Rep., 387. Whittemore vs. Adams, 2 Cowen's Rep., 626. When a party comes into the Courts of this State to enforce his *remedy* upon his contract, that remedy will be enforced in accordance with the laws of this State regulating *that remedy*, and *not* according to *the remedy* provided for the enforcement of similar contracts in the State of South Carolina, although the contract may have been made in the latter State.

We have already shown what is the rule of law in this State, regulating the remedy against securities, and what acts of the creditor will discharge the security from liability on his contract as such security. But it is contended that the rule asserted by this Court, in regard to the liability of securities, in Jones vs. Whitehead, was not the judgment of the Court, but merely the *obiter dictum* of the Judge, who delivered the opinion in that case. Perhaps that is quite as *convenient* a way to dispose of that case, and the reasons contained in it, upon the present occasion as any other: but the majority of the Court do not take that view of it. We think the following legal proposition was necessarily involved in the judgment of the Court in that case: "It is urged, however, by the distinguished counsel for the plaintiff in error, that the statute of 1831, contemplates *some act* to be done by

Toomer *vs.* Dickerson.

the creditor. I reply, *the law enjoins a duty to be performed.* And the neglect, or refusal, of the creditor to sue, after notice, is equally culpable as though he had expressly released the principal by giving *time,* accepting a *composition,* or parting with collaterals, without the privity of the defendant. It was the servant who *knew his master's will,* and did it *not,* that was beaten with many stripes." The question in that case was whether the *omission* of the creditor to sue one of the securities, after notice to do so, within the time required by the Act of 1831, operated as a discharge of his co-surety. It is insisted in this case that there must be *some act done by the creditor* in order to release the security ; that the Code contemplates only the *action* of the creditor—not *inaction.* We reply, that the Act of 1827, embodied in the Revised Code, requiring the mortgage, held by the creditor in this case, to be recorded in six months after the removal of the mortgaged property into this State, *enjoined a duty to be performed by the creditor holding that mortgage,* so as to preserve its lien upon the mortgaged property, that the security might have the benefit of it, in the event he had the debt to pay : for it is not unreasonable to suppose that he may have been mainly induced to become the security for the payment of the debt in view of the fact that the mortgage had been executed by his principal to the plaintiff to secure its payment. If it was now an open question in this Court, which it is not, in the opinion of a majority of the Court, we should be extremely unwilling to establish the rule that a creditor holding a mortgage upon the property of his principal debtor to secure its payment, should be permitted to omit or neglect to perform his duty as required by law, whereby, in consequence of such omission or negligence of duty required by law, the risk of the security is increased or exposed to greater liability, and yet, that such creditor should be allowed, under such circumstances, to hold the security liable for the payment of the debt. For the creditor to remain *passive* when there is *no law* requiring him *to act,* is one thing, but to remain *passive* when *the law enjoins upon him a duty to be performed* in regard to matters in which the security, for the

payment of his debt, has an interest, is another and different thing. The creditor should not be allowed, simply because he has *ample personal security* for the payment of his debt, to remain *passive* and *negligent* in the performance of his duties enjoined by law, so as to *increase the risk* of such security, or to expose him to *greater liability.* And such the majority of the Court believe to be the rule, established by the decisions of this Court, and adopted by the Legislature, in the Code, declaring what is the law of the State upon that subject. We do not consider that we have the right, if we had the inclination, to alter or change that rule of the law applicable to the liability of securities ; our duty is simply to administer the rule as we find it, and as we think the Court below has done in this case. Let the judgment of the Court below be affirmed.

NOTE.—WALKER, J., concurring, wrote out no separate opinion.

HARRIS, J., dissenting.

John F. Tucker, of the city of Savannah, bought of Henry Laurens Toomer, of Charleston, South Carolina, on the 1st December, 1857, ninety-one slaves, for the sum of $53,650, upon a credit, payable by installments. For the purchase money, Tucker made his bond, with Dickerson, of Savannah, as security thereto ; and on the same day Tucker executed a mortgage on the slaves so bought and gave the same to Toomer, as cumulative security.

The mortgage was conditioned that upon default of payment, as stipulated by the bond, he, Toomer, might enter and take possession of the slaves and sell and dispose of the same at his pleasure, accounting to him, Tucker, for the overplus.

To this mortgage it does not appear that Dickerson was a party, or that he was induced to become surety on the bond by reason of this cumulative security, or that he had stipulated inany wise in reference to it.

The mortgage being a part of a Carolina transaction, was only recorded, according to the laws of that State, on the 23d December, 1857. The negroes were, shortly after their

Toomer *vs.* Dickerson.

purchase, removed by Tucker to Chatham county, Georgia. But, upon examination of the register of deeds and mortgages of that county, no record of this mortgage was found to have been made up to 1866.

Suit, during the year 1866, was instituted in Chatham Superior Court, on the bond, against Tucker, principal debtor, and Dickerson, his surety. To this action Dickerson, amongst other pleas, set up as a defence, that as surety on the bond he *had been discharged from all liability by reason of the failure of Toomer to record the mortgage of Tucker* within the time prescribed by the law of Georgia.

. The plea as to loss by emancipation of the slaves, and others, were overruled ; this, as to the failure of Toomer to record the mortgage of Tucker was held good, and under the direction of the Court, a verdict was found for Dickerson. A new trial was moved for by Toomer on various grounds, and was refused.   That refusal has been brought, by writ of error, to this tribunal and by the majority has been affirmed. I cannot concur in the charge of the Judge below touching the plea sustained by him, in *either his law or reasoning*, and therefore dissent from the judgment of my associates.

The whole transaction being a Carolina one, and complete and valid by her laws, and by those laws the surety, Dickerson, being bound by his engagement and liable to respond to Toomer *without being entitled to any relief whatever*, I am unable to perceive any reason why, upon principles of comity, and especially that of *lex loci contractus*, in the Courts of Georgia, Toomer should be denied that redress he would have been entitled to had Dickerson been an inhabitant of Carolina.

But I shall not discuss this point in the record.   I proceed to examine the main question upon which the affirmance has been made of the decision below, viz : Does the law of Georgia authorize the discharge of a *surety on a bond* because the creditor, who has taken of the principal debtor a cumulative security, in the form of a mortgage by that debtor on the property he purchased, *failed* to record (within the time prescribed by the law of Georgia) that mortgage ?

It is not pretended by those who hold the affirmative that their decision has been made in conformity to the principles of the common law, but in accordance with the decisions of this Court and the Code of Georgia, which they assert have changed the common law. When asked for those decisions and portions of the Code making the changes alleged by them, they cite Jones *vs.* Whitehead, 4 Kelly R., 399, and sec. 2126 of the Code.

Let us subject these references to such an examination as the importance of the question considered demands. The first remark I make upon the case from 4 Geo. R., is that it was made under the act of 1831. Prince Dig., 471. That act gave *the right* to a *surety* on any note or other instrument, after it had become due, *to require the holder or creditor to proceed to collect* the same within three months; *if the holder failed to comply with such requirement,* the surety was declared to be no longer liable. Until this act, there was no such right belonging to a surety, and no such consequences as his discharge could have resulted. This was a change in the common law of a most important character. Before that act, the substance of which is incorporated in section 2128 of the Code, a surety on bond or note could not have availed himself, when sued on it, of any such defence as that he had given notice to or required the holder to sue the principal in the bond or note, and that he had failed or refused. The surety could, previously, only have protected himself against apprehended insolvency of his principal by paying up the bond or note to the creditor and then at his, surety's, own expense suing his principal.

To remedy this, which the Legislature deemed an evil, it passed this act.

It is to be carefully remembered that no relief whatever is given to the surety by the *passiveness, omission or neglect* of the creditor to sue the principal debtor on such contract. None *except in the special case where the surety had required suit* to be brought in pursuance of the provisions of this act. If he did not give notice or require suit to be brought,

he was left upon the precise footing where the act of 1831 found him.

The facts in the case of Jones vs. Whitehead were determinable, properly, *only by that act;* the question there being whether Whitehead, a co-security with Reynolds for Jackson, was not entitled to be discharged, because of Reynolds having required Jones to sue Jackson and Jones' *failure to comply with such requirement;* or, in other words, Reynolds, a *surety,* having been discharged by the *failure* of Jones to sue Jackson, was not Whitehead, a co-security, *by operation of law,* entitled, also, to be discharged, as the discharge of Reynolds, by operation of law, produced a material change in the contract, prejudicial to Whitehead?

I take the rule stated by Chief Justice Marshal, in Sturges vs. Crowninshield, 4 Wheaton, to be of universal application: "The *positive authority* of a decision does not extend *beyond the facts* on which it was made." I have quoted this rule with a view to exclude many things which were introduced into the opinion of Chief Justice Lumpkin, which had no direct application to the case in the record, *irrellevant to its facts,* and which being found there and not carefully analyzed by those who have quoted them, has caused all the confusion of legal principles, to my mind, so apparent in the decision of this case below, and its affirmance here.

*Beyond* the change made by the act of 1831, in the principles of the Common Law, I cannot think any was made.

That act, it will not be pretended, has any application to the facts in this record, and can furnish no rule for their decision; nor, legally, can the case of Jones vs. Whitehead, 4 Kelly, decided under it.

That case was decided in 1848. *It* surely made no change in the Common Law, when it announced as the sum and substance of the English and American adjudications, "that whenever the creditor *does an act* whereby injury, or loss, or liability to loss, or *increased risk* accrues to surety, without his assent, he is entitled to be discharged?"

This *summary* was not a statement of our Statute Laws,

for none existed at that time, on this subject; it but *grouped together* principles of the Common Law which had been extracted from hundreds of decisions.

The Code of Georgia was adopted in 1862, and section 2126 of it was extracted from *this summary* of Common Law decisions in 4 Kelly. Where then is the change or alteration of the Common Law in that summary, or paragraph of the Code embodying it? It is a profound mistake into which they have fallen in alleging *any change in general principles*, except that made by the act of 1831, and that has no just application to this case.

But it is said that the case in 4 Kelly establishes the rule that *the omission or failure on the part of the creditor to do an act required by law, discharges the surety.* I have stated that the case in 4 Georgia was decided alone on *its facts*, and those facts brought it strictly within the act of 1831. No such rule can *legitimately* be deduced from that decision. *The surety had required the creditor to proceed to collect the note out of principal debtor, and he failed to comply with such* (right in the surety) *requisition*, and it *was failure* to comply with that *requirement*, upon which the decision was necessarily made. This wresting of a *particular* rule for particular cases, and *attempting to give to it the character and force of a general rule*, applicable to and controlling cases not within that special rule, itself being an exception, is mischievous in its effects and destructive of the sound reason upon which the law reposes.

Before pronouncing that an *omission* of creditor *to do an act* required by law, was established by 4 Kelly, and Dickerson entitled to its benefits, it would have been well in my brethren to have looked into the record to ascertain a fact most essential to bring Dickerson's case within the scope of Jones vs. Whitehead, viz: Where does it appear that Dickerson, the *surety* on the bond with Tucker, *ever required Toomer* to proceed to sue it or collect it? Where did ever Dickerson even *require* the *collateral* security—the mortgage—to be recorded?

It should be also borne in mind that the case in 4 Georgia

grew out of the failure of the creditor to sue the principal debtor on an *original* contract, when *required* by the surety to do it. *There was no collateral security in that case*, nor is there to be found even among the irrelevant things said *obiter a single principle enunciated in reference to the conduct of the holder as to the collateral securities in his hands ! !*

This case here belongs *exclusively* to that branch of the Common Law which prescribes the duties and relative rights of creditor and surety touching *collateral* securities in hands of creditor.

To sustain the *new rule* of law which my brethren have announced, they have cited with approbation the English case of Capel vs. Baker, 2 S. and S. It is strange that that case, made under the guidance of Common Law principles, should be quoted by them to sustain the assertion that our decisions and Code had altered the Common Law. That case, so far from lending any aid to the decision here, is a most perfect demonstration of its being erroneous. By reference to the report of it, the head note is in the following words : "If, by the *neglect* of the creditor, the benefit of some of the securities for the debt is lost, *the surety is pro tanto discharged.*"

White sold, by indenture, an annuity to Butler, the defendant, and secured the payment of the same, as it might fall due, by a warrant of attorney to confess judgment for him in the sum of £3,000, by a demise of leasehold premises *and by an assignment* of two trows or ships belonging to said White, which in said indenture were covenanted to be British built and respectively registered according to the laws in force. In pursuance of the agreement in the indenture contained, a bond was made by White, with plaintiff, Capel, as surety, in the penalty of £3,000, in which bond was recited the agreement for the sale of the annuity, the indenture and securities given. *The formalities required by the ship register acts were not complied with upon the assignment of the vessels.* White, to whom the vessels belonged, *taking advantage of the omission*, sold the vessels and applied the proceeds to his own use.

The Vice Chancellor, Sir John Leach, held that as the

value of the two vessels were lost to the surety on the bond, by *the neglect* of Butler, he, the surety, was entitled *to relief to the extent of the value thereof.* And this case has been relied on to support the new doctrine that the omission of a creditor to record a mortgage within the time required by law, discharges the surety *entirely ! ! !*

In this case it is to be noted that the surety on the bond, when entering into it as a joint obligor, *stipulated* for the registry, respectively, of the vessels, *with the creditor*, and *but for that stipulation* in regard to such a collateral security, he could not, as surety on the bond, in the English Courts have been entitled to any relief whatever which arose from the creditor's neglect.

Dickerson, the surety here, unlike Capel there, was no *party* to the taking of the mortgage of Tucker—made *no stipulation* about it—yet he gets a relief far beyond what was accorded Capel, *upon what reason it is difficult to discover*, unless in the benignity of our Courts, as he failed from imbecility or carelessness to protect himself, as Capel did, it became their bounden duty to shield, by the *most liberal interpretation* of our laws, all sureties from accountability to that abominable and accursed race of Shylocks, commonly called creditors ! !

I have said that by section 2126 of the Code no change in the principles of the Common Law was made, and this is demonstrated by the summary made of them in 4 Georgia, and its identity with section 2126.

Repeating an idea which should be kept constantly in view, that that summary and section 2126 have reference solely to the relative rights of creditor and surety as to the *original contract* to which the surety is a party promissor, and have none whatever as to collateral securities in the hands of the creditor, I proceed to point out portions of the opinion of Judge Lumpkin in 4 Georgia which probably have misled my associates.

" *By releasing* one of the sureties, the creditor changed the terms and the legal effect of the contract, and that, too, without the consent of the other parties." Why speak of a re-

Toomer *vs.* Dickerson.

lease of surety, made by *operation of law*, as if it was *the act* of the creditor, when there was *no act* of the creditor, in that case ?    Undoubtedly a release *by the act* of the creditor of one of the sureties discharges the other, and the general principal is right, but the facts did not demand its enunciation there.    The co-security, Whitehead, was discharged under the provisions of the act of 1831, simply because Jones, the creditor, *failed* to sue the principal debtor on the note after the surety, Reynolds, had required him to proceed.    The discharge, in this case, did not spring from *any act of Jones*, but from *the operation of a special law*, providing relief to a surety, where his right had been disregarded.    *There was no release by the creditor.*

Again : " We desire, however, to place this judgment upon a broader, firmer foundation than mere grammatical learning or technical rules."    The act of 1831—a departure from Common Law principles—furnished the *sole rule* for the decision of Jones vs. Whitehead.    What necessity required the enunciation of other principles of the Common Law, however abstractedly true, when they had not the slightest pertinency to the facts in that record ?    Thus : " we believe, however, that the following propositions may be assumed as the sum and substance of the English and American adjudications upon this subject, namely : that whenever the creditor *does an act* whereby injury, or loss, or liability to loss, or increased risk accrues to the surety without his assent, he is discharged, and the Courts uniformly refuse to require the surety *to show that he has in fact been damnified,* holding that he is entitled to judge for himself what is for his own benefit, that of that he is the only judge, and that another party cannot decide for him without discharging him."

I freely concede that this summary comprehends nearly the whole law touching *the acts of creditors* in reference to *original* contracts, whereby a surety *thereto* may be affected and the consequences which in law ensues from such acts, but I ask *what act* of Jones was there in the case he was deciding, upon which he predicated this statement of legal principles .

30

and their consequences ?    I am unable to perceive anything
which authorizes it.

Again :  " The estalished rule in equity is, if the creditor
*take any step or do any act* by which he essentially jeopardizes
the safety of the surety, the latter is discharged." This is
virtually included in the general summary just quoted, and
needs no other comment than what has been made.

In the infancy of this tribunal, the learned and very able
Chief Justice who delivered the opinion in 4 Georgia, enter-
tained and acted upon the conviction that the Court could best
subserve the purposes of its institution, by deciding in a case
before it all the principles of law which he supposed had any
pertinency to the subject whether, directly or indirectly, in-
volved, under the honest but most mistaken impression that by
so doing he would greatly lessen, perhaps close up, the foun-
tains of future litigation.   The case in 4 Georgia is fairly
entitled to a *conspicuous* place in that class of decisions.   It
has, by the introduction into it of legal  principles *wholly in-
applicable to its facts,* led  to  serious  misapprehensions and
misapplications  of  those  legal  principles  unnecessarily in-
troduced, as is apparent from the decision in this case.

That no change was made of the principles of the Com-
mon Law by section 2126, is evident from that section being
but an extract of what he  said  in 4 Kelly.   Without such
change as has been mistakenly assumed and acted on, it was
obviously the duty of the majority here to let this case be
controlled by those principles.

At Common Law the distinction between the *acts* of a
creditor in reference to the *original* note or contract, to which
the surety is a promisor, and that of the *failure* or *negligence*
of creditor to act, is clearly marked.   If the creditor by *any
act of his,* releases one surety or compounds with him, the co-
security will be discharged, as *the act* of the creditor changes
the original contract.

If the creditor, by *any act, changes or varies* the original
contract, so as to make a new one of it, the surety not having
assented to the act, is discharged.

If the creditor grants indulgence to the principal debtor

Toomer *vs.* Dickerson.

for a consideration, without assent of the surety, the surety is discharged. Or if the creditor, by *any act* of his, disables himself from pressing the collection of his debt out of the *principal* debtor, the surety is discharged thereby. And generally if the creditor *does any act* whereby injury or loss ensues to the surety, or *any act* which subjects the surety to *liability to loss, or any act* which subjects the surety to *increased risk*, without the assent of the surety, the surety in each and all these cases, is discharged thereby from all liability, and if sued on the original contract, may show in his defence any one of *these acts of the creditor*, and upon proof of it, will be discharged without being required to show that *he was actually damnified* by *such act*, for the law has declared that in reference to *these acts* of the creditor the surety is entitled to judge for himself of what is for his benefit, and that he is of it the only judge, and that the creditor cannot in such cases decide for the surety without discharging him.

Beyond this class of cases, *all arising from the acts* of the creditor, and in reference to the *original* contract, there is not to be found, I apprehend, a decision at Common Law *discharging* a surety.

*Failure* or *omission* to act furnishes, at Common Law, with reference to the remedies of a creditor or contract itself, no defence to a surety whatever. The remedies of the creditor, under the contract against the debtor or his estate, are not held as *trusts* for the surety. The surety will not be discharged by any degree of passive neglect in not enforcing them. Williams vs. Price, 1 S. & S., 581. Goodloe vs. Clay, 6 B. Monroe, 236. A surety will not be discharged by failure of the creditor to retain or keep a hold on land of the principal by entering judgment or reviving judgment as long as the loss arises from the *inaction* of the creditor. The *inaction* of the creditor, resulting in loss of a lien which would otherwise have been available for the payment of the debt of the principal, furnishes no ground for the discharge of the surety. United States vs. Simpson, 3 Penn. R., 437. Mandorf vs. Singer, 5 Watts, 179. Farmers' Bank Ohio vs. Reynolds, 13 Ohio, 84.

A surety cannot resist a suit on the contract to which he is a party, either at law or in equity, on the ground that the creditor has *omitted* to take measures against the principal debtor, and that in consequence all opportunity of collecting the debt from him is lost. King vs. Baldwin, 2 John Ch. R., 554; 18 Pickering, 238. The general rule is that the creditor may *abstain* from active measures against the principal. He may even relinquish measures taken to enforce the collection of the debt, provided he does nothing which impairs or prejudices the remedies or rights of the surety, or interposes any obstacle to the collection of the debt. Lenox vs. Prout, 3 Wheaton, 520.

The cases referred to sufficiently attest the uniformity with which these Common Law principles have been acted on in England and America. I add that our Code has distinctly re-enacted them, as will be evident from a careful examination of Article 2, p. 418. Section 2126, recognizes the distinction clearly between the *acts* of the creditor touching the original contract, and the *failure* or *negligence* of the creditor in reference to it. Thus a mere *failure* by the creditor to sue as soon as the law allows, or *negligence* to prosecute with vigor, his legal remedies, unless for a consideration, will not discharge a surety. It cannot have escaped the notice of the bar, that in the Code there is no paragraph *as to the duties of the creditor in reference to collateral securities* in their hands and the measure of relief to a surety on original contract from malfeasance or misfeasance of the creditor in regard to them.

This absence makes it necessary that we should collect from the report those rules, and present them, for if Dickerson has a right to *any* relief whatever, it is to be derived only from them. If a creditor, by his *action*, releases the lien of a judgment or mortgage, or withdraws a levy made on the property of the principal debtor, or surrenders a security held by him to the prejudice of the surety without his assent, the surety may claim a credit on his engagement to *the full amount or value of the property or security*

*surrendered.* 2 Watts Repts., 136. 8 Levy & Rawle, 452. 16 Levy & Rawle, 252.

Where securities or liens are given to a creditor to secure a debt, he cannot relinquish any one of them thus given, to the prejudice of the surety on the original contract, thus secured, without discharging the surety *to an extent corresponding with the value of the security surrendered.* Thus in case of Williams vs. Price, 1 S. & S., 581, a judgment had been assigned to the creditor as a collateral security, execution had issued and been placed in the hands of the sheriff, the creditor *directed* the sheriff not to levy it, whereby other executions obtained a priority, it was held that the surety was discharged *pro tanto* of the debt on account of which the judgment had been assigned.

The parting with a security is immaterial, unless the surety shows that he has suffered thereby and *the extent of* it, otherwise he can have no relief. Ward vs. Vass, 7 Leigh, 135.

The lien acquired by levy, if relinquished by a creditor to the injury of the surety, discharges him to *the extent of the value of property levied.* 6 Alabama, 718; 2 Geo. R., 290; 2 Geo. R., 405.

Finally, I take it, that no rule is better settled than that the *negligence,* or even malfeasance, of a creditor *as to securities* held by him, can only be material when his conduct has resulted in *actual* injury, and that the surety in such case will be discharged *only to the extent* of the injury *sustained* by *such culpable neglect* or *malfeasance.* 6 S. & Marshal, 24. 5 Harris, 297. 1 S. & S., 581.

In Hampton vs. Levy, 1 McCord Ch. R., 107, and in Levy vs. Brevard, 3 Stobhart, Eq. R., 50, liens by mortgage were given to the creditor by the principal debtor, the creditor *omitted* to record the mortgages held as collateral securities, and thereby they were postponed by law (as in Georgia) to subsequent incumbrances. It was held that the *omission* to record could not be set up as a defence by the *surety* to an action against him. These cases are parallel in every particular with the case of Toomer vs. Tucker, and Dickerson security.

From the English and American decisions, we may extract these general propositions:

1. That the creditor has nothing more to do in regard to the original contract, held by him, than to refrain from *acting* in a way to injure the surety—that he may remain *quiet* and *inactive*, (in all cases, except when required to sue under paragraph 2128,) and the surety will not be discharged.

2. That as to remedies belonging to the creditor, he may remain passive, as they are not held as trusts for the surety, and the surety cannot entitle himself to any relief from the *inaction* of the creditor in regard to them.

3. That as respects *collateral* securities held as trust for the indemnity of the surety, the creditor cannot surrender any lien so held, or by malfeasance or misfeasance do any injury to the surety, without discharging the surety, *in proportion to the actual injury he has sustained.*

It is a fact which cannot be disputed that Dickerson, the security, complains of *no act* of Toomer in reference to the bond to which he was a joint and several obligor; there being no act of the creditor, there is no principle of law or equity to be found even in the most wretched system that exists that would discharge the surety from all liability.

Dickerson's claim to relief stands alone on the *neglect* of Toomer to record the mortgage of Tucker, given as a cumulative surety.

Considering that mortgage as a *collateral security* for the indemnity of Dickerson as security on the bond, in Toomer's hands—if by Toomer's culpable neglect in failing to record the mortgage in Georgia, Dickerson has sustained any *actual injury*, (and that he must show) *that injury thus sustained* is *the exact measure of the relief* to which, in all cases of collateral securities, he is entitled; or the adjudications I have referred to are not law.

The record shows no *actual loss or injury* in any respect as having been sustained by Dickerson, nor does it even show that any judgments or liens were obtained against Tucker, to which the mortgage held by Toomer was postponed in consequence of failure to record the mortgage.

Toomer *vs.* Dickerson.

I cannot account for the decision below and affirmed here, but from the confounding the *act* of the creditor with *the neglect or omission of creditor to act.* The poles of the earth are not wider apart. With full as much reason can my associates maintain that darkness is light, cold is heat, rest is motion. Whenever these correlatives can, by judicial decision, be made identical, then I may cease to think there is a difference between the *action* of a creditor and the *non-action* of a creditor, but not till then.

By thus confounding *inaction with action,* they have interpreted section 2126 of the Code as if it read thus :—Any act of the creditor (or *omission* of creditor *to do* an act required by law) either before or after judgment against the principal which injures the surety—(or any *omission to record a mortgage held by creditor as collateral security*) which increases surety, risk, etc., etc.

To thus interpolate section 2126 is to interpolate principles of law neither authorized nor intended by the Legislature. I have placed in parenthesis such interpolations that it may be seen that I have done no injustice. Without such words interpolated, it was utterly impossible to have perverted the clear and well defined principles of the Common Law embodied in this section, so as to authorize the discharge of the surety. There is, perhaps, no better mode of testing the soundness of a decision than to run out the principle on which it rests to its legitimate consequences. The decision here asserts the broad principle, and without an exception or qualification, that the *failure* of a creditor to record a mortgage within the time prescribed by our statutes, subjected Dickerson, the surety on the bond—for whose benefit this cumulative security was held by Toomer—*to an increased risk,* and thereby Dickerson was absolutely discharged from all liability on the bond. Is not the inevitable consequence from this, that however *small* the collateral security by mortgage may be held by creditor, the *failure* to record it *discharges* the surety on the original contract, no matter how much larger it may be than such mortgage; *or* in other words, if the surety is bound in a bond for fifty thousand dollars, and a mortgage

is given by the principal debtor to secure *fifty* dollars only, and the creditor *fails* to record the mortgage—the surety's risk being increased thereby—he is discharged entirely from his obligation on his bond to pay fifty thousand dollars. This absurd and most iniquitous result is the fruit of a mistake of law.

'Twas only a few years since that this Carolinian had to bear in common with the people of his State the terrible wrath, in an age of Christianity and high civilization, of a military leader who emulated and transcended in barbaric ferocity the example of Attilla—and this was borne with the fortitude which patriotism only could inspire—but to be stripped by the mistaken judgment of a Georgia Court of the little left him by the marauder, is a cruel fate, which even the most exalted religious philosophy does not command him to endure without complaint.